FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

99 JUL 19 PH 4: 03

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| BYRD-MOORE PARTNERSHIP, an Alabama General Partnership composed of Harry Edward Moore, Jr., an individual; Martha Coley Moore, an individual; and The Byrd Companies, Inc., Realtors, an Alabama Corporation | ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CV-97-BU-2420-S |
| RHODES, INC.; HELIG-MEYERS COMPANY, INC., | ) ) ) ) | |
| Defendants. | ) ) | |
| RHODES, INC. | ) ) | ENTERED |
| Counter-claimant/Third-Party Plaintiff, | ) ) ) ) | JUL 19 1999 |
| vs. | ) ) | |
| BYRD-MOORE PARTNERSHIP; | ) ) | |
| Counter-claim Defendant, | ) ) | |
| THE BYRD COMPANIES, INC., REALTORS; W. WOOD BYRD, JR., | ) ) ) | |
| Third-party Defendants. | ) | |

## MEMORANDUM OPINION



This case is presently pending before this Court on Defendants' Motion for Summary Judgment, (Doc. 58) and Counterclaim Defendant and Third-party Defendants' Motion for Summary Judgment (Doc. 55). The claims and counterclaim/third party claims arise from an agreement between Plaintiff, Byrd-Moore Partnership [hereinafter "Byrd-Moore"], and Defendant, Rhodes, Inc., in which Byrd-Moore agreed to construct a store and lease it to Rhodes. Byrd-Moore contends that Rhodes breached the agreement by wrongfully terminating the agreement and for failing or refusing to pay for certain change orders. It also contends that Rhodes, and Defendant Helig-Meyers Company,[1] wrongfully interfered with its business relations with the lender for the project. Byrd-Moore seeks specific performance of the agreement and money damages. Rhodes filed a counterclaim/third party claim against Byrd-Moore and The Byrd Companies, Realtors and W. Wood Byrd, Jr.,[2] in which it alleges breach of contract for liquidated damages and construction, fraud, and defamation. It seeks liquidated damages and a declaratory judgment, in addition to money damages.

---

[1] The only Claim asserted against Defendant Helig-Meyers Company is the intentional interference claim. Helig-Meyers merged with or otherwise acquired Rhodes after the agreement at issue in this case was executed.

[2] The Amended Counterclaim does not refer to Byrd Companies, Inc., Realtors and W. Wood Byrd, Jr. as "third-party defendants." However, as these parties were not named plaintiffs in the original Complaint in this action, they are properly termed "third-party defendants," and not "counterclaim defendants." See Fed. R. Civ. P. 13 & 14.

I    SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties bring to bear in order to ascertain whether there is a genuine need for a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)(quoting Advisory Committee Note to 1963 Amendment to Fed. R. Civ. P. 56(e)). Summary judgment is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

A party seeking summary judgment has the initial responsibility of informing the court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party's burden is not meager; it must illuminate for the court the reasons why the non-moving party cannot or does not raise a genuine issue of material fact sufficient to support a trial. *Clark*, 929 F.2d at 608. The moving party's burden was set forth in *Clark* as follows:

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met

does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. Even after *Celotex* it is never enough to simply state that the non-moving party cannot meet its burden at trial.

*Id.* (citing *Celotex*, 477 U.S. at 323-25, 106 S. Ct. 2553-54).[3]

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); *see Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id.*; *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th

---

[3]The Eleventh Circuit recognized that *Celotex* created "an exception to the *Adickes* [*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)] rule for [an] uncommon situation," i.e., "one neither party could prove either the affirmative or the negative of an essential element of the claim." *Clark*, 929 F.2d at 607, 608. In this "uncommon situation," the *Celotex* exception allows a moving party to carry its burden by showing or "pointing out," by reference to record, that the non-moving party cannot prove its claim. *Id.* at 607.

Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S. Ct. 74, 133 L. Ed. 2d 33 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55, 106 S. Ct. at 513. The court, however, must not weigh conflicting evidence for probity or make credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather determine whether such issues exist to be tried. The court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993)(citations omitted). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

## II.   STATEMENT OF FACTS

On August 1, 1995, Byrd-Moore and Rhodes, Inc. entered into an agreement requiring Byrd-Moore to construct a 45,000 square foot building to be used as a furniture retail store. Rhodes, as the tenant, agreed to lease the building after construction for a

period of 25 years at $8.00 a square foot, or $360,000.00, a year. The delivery date, as
amended, was December 1, 1996.

In order to construct the building according to the plans and specifications, Byrd-
Moore was required to relocate an existing sewer line located on the site in an easement
held by Jefferson County. The agreement specifically refers to the relocation of the sewer
line. See Def. Exh. 1, § 4.2. The agreement contains a warranty clause, whereby Byrd-
Moore warranted that it had all necessary approvals for beginning construction on or before
August 1, 1996. See Def. Exh. 1, §§ 3.1(b), 3.2; Def. Exh. 2. [4]

Mr. Byrd, in an affidavit, stated that Byrd-Moore did not submit its request to the
County regarding the relocation of the sewer line until after the agreement was signed. He
states:

---

[4]Section 3.1(b) provides:

To induce [Rhodes] to enter into this Lease, [Byrd-Moore]
represents and warrants to [Rhodes] as follows:

. . .

(b)      That the Project is zoned in a manner permitting the
construction of the Premises and the Common Areas, and the use of such
building for retail purposes. [Byrd-Moore] further represents and warrants
that it has obtained (or will obtain prior to the expiration of the
Contingency Date set forth in Section 3.2(b) hereof) approvals from (i) all
federal and state environmental protection agencies necessary for the
construction and operation of the Project improvements . . . provided for in
this Lease, and (ii) *all governmental agencies necessary for the
construction of: . . . (z) all storm and drainage and sanitary sewer
service necessary to serve the Project* when constructed in accordance
with the Site Plan.

Id. (emphasis added).

Page 6 of 28

It had been the custom of Jefferson County to promptly approve such requests once they were reasonably satisfied that the plan was technically sound. However, Byrd-Moore's request was delayed. We later discovered that the County was considering a significant change to the sewer system and therefore, they had not decided where the relocation should be placed and the size of the new sewer line to be installed.

Def. Exh. 2 (Response to Plaintiff & Third-Party Defendants' Motion for Summary

Judgment).

After construction began, Jefferson County sent a cease-and-desist notice to Byrd-

Moore in October 1996. The notice stated:

We have been advised that you are in the process of constructing a building on the above referenced property. We further understand that one or both of your building contractor[s] . . . have constructed support footings for this building directly above an active Jefferson County trunk sewer line.

Please be advised that Jefferson County has a valid and enforceable sewer easement that crosses subject property . . . . We cannot allow you to construct a permanent structure on this easement. Accordingly, you must immediately remove the support footings from within the sewer easement.

This office further understands that The Byrd Companies, Inc. has been negotiating a sanitary sewer construction/participation agreement with the Jefferson County Environmental Services Department that includes relocating the above mentioned sanitary trunk sewer. However, no agreement has been finalized. Until such time as an agreement is consummated, no further construction activity can be permitted within the County's sewer right of way.

(Doc. 57, Exh. H)

Final plans for relocating the expanded sewer line were not approved until

December 1996. The agreement between Byrd-Moore and Jefferson County and the

selection of an approved contractor to relocate the sewer line did not occur until February

of 1997 and the sewer line was not completed until May 1997.

Page 7 of 28

The premises were constructed around the sewer easement, leaving a gap in the

building. This gap was filled in after completion of the sewer line in May 1997. The

relocation of the sewer line also delayed the construction of the landscaped areas and the

parking lot.

Under the terms of the agreement, the premises were to be delivered on December

1, 1996. For every day of delay, Byrd-Moore was to pay Rhodes $913/day. The

agreement provided:

### Section 4.5   Damages for Delay

(a)   [Byrd-Moore] acknowledges that [Rhodes] will incur
substantial expenses in anticipation of opening its business in the Premises
on or before the date specified herein, and that a delay either in the delivery
of the Premises to [Rhodes], or in the completion of the Initial Common Area
Improvements necessary for [Rhodes to open for business in the Premises,
will cause [Rhodes] to incur substantial damages which cannot reasonably
be estimated in advance. Accordingly, if [Byrd-Moore] shall fail to deliver the
Premises and Initial Common Area Improvements to [Rhodes] by [December
1, 1996],[5] then [Byrd-Moore] shall pay to [Rhodes] as liquidated damages the
amount of Nine Hundred Thirteen and no/100 Dollars ($913.00) for each day
that delivery of the Premises is so delayed beyond [December 1, 1996];
provided, however, in no event shall [Byrd-Moore] be obligated to pay
[Rhodes] for any day of delay arising or resulting from any delay caused by
or through [Rhodes], its employees, agents, or contractors.

(b)   All liquidated damage payments required of [Byrd-
Moore] shall be paid to [Rhodes] no less frequently than weekly, and [Byrd-
Moore] shall be deemed in default herein under if any such payment is not
made within thirty (30) days after the date on which such payment is due.
*If [Byrd-Moore] defaults in any such payment, [Rhodes], in addition to
the right to sue for payment thereof, shall not be required to open for
business or pay Minimum Rent and other charges payable by [Rhodes]
under this [agreement] until such payment is made by [Byrd-Moore],*

---

[5]The dates of the original agreement were changed pursuant to an agreed-upon
amendment. Def. Exh. 2, ¶¶ 3 & 4.

*and [Rhodes] shall have the right at any time after one hundred (100) days following the date on which such payment is due and prior to the time such required payment is made by [Byrd-Moore] to [Rhodes] to terminate this [agreement] by written notice of termination to [Byrd-Moore].* In the event of such termination, the parties shall have no further rights or obligations under this [agreement] except for [Byrd-Moore's] payment of such liquidated damages due to [Rhodes] pursuant to section 4.5, and [Rhodes] shall have forty-five (45) days to remove any fixtures, inventory, or other personal property it may have placed in the Premises, without the obligation to pay Rent hereunder for that period. Interest shall accrue at the rate of twelve percent (12%) per annum on the outstanding principal amount of liquidated damages, if any, past due pursuant to this Section 4.5 commencing on the thirtieth (30th) day after the date on which such payment is due, until such principal amount is paid. Upon the request of [Byrd-Moore], [Rhodes] shall promptly confirm in writing the amount of such payment(s) due.

(c)     If the Delivery Date has not occurred by [March 28, 1997], in addition to the entitlement to liquidated damages as herein above set forth, [Rhodes] may, upon written notice to [Byrd-Moore] within sixty (60) days following [March 28, 1997] terminate this [agreement] and neither [Byrd-Moore] nor [Rhodes] shall have any further rights and obligations hereunder, except that the obligation of [Byrd-Moore] to pay [Rhodes] its liquidated damages shall survive such termination.

(d)     If [Byrd-Moore], its contractors, agents, or employees is (are) prevented or delayed in the construction of the Premises, the Initial Common Area Improvements or the Project, or if [Byrd-Moore], its contractors, agents, or employees is (are) delayed in the occurrence of the Commencement Date or due to delays caused by an event of Force Majeure, the [Byrd-Moore] shall provide [Rhodes with notice of such delay and the amount of time of such delay, in which such event the dates and schedules set forth above in this Section 4.5 shall be adjusted and extended accordingly to properly reflect the delays caused by an event Force Majeure; provided, however, *no event of delay shall be deemed to be a consequence of Force Majeure should [Byrd-Moore] have failed to provide notice to [Rhodes] of such delay contemporaneously with the time of the delay.*

Def. Exh. 1, § 4.5 (emphasis added).  The notice required under this section was to be given in writing. *Id*. § 20.4.

The agreement's force majeure provision allowed the delivery date to be extended due to forces beyond the control of the parties, such as rain exceeding historical normal amounts and hostile government action. The agreement defines "force majeure as follows:

> Any strikes, lock-outs or labor disputes, scarcity of labor, materials, supplies or energy, or reasonable substitutes therefor, acts of God, enemy or hostile government action, civil commotion, terrorism, riot or insurrection, fire or other casualty or other events or occurrences which are beyond the reasonable control of the party obligated to perform hereunder or which are caused by the other party hereto; provided, however, that rain shall not constitute an element of force majeure except to the extent the amount of rainfall during the period from the commencement of construction by [Byrd-Moore] to the completion of construction of the Premises pursuant to Article 4 exceeds the historically normal amount of rainfall experienced at the Premises during such period.

*Id.* § 1.1(d). The agreement also provided that any delay caused by an event force majeure would "suspend for the period of delay" the performance of an act and would extend the deadlines for performance "for the period necessary to complete performance after the end of the period of delay." However, no event was a "force majeure" event unless notice was given contemporaneously with the delay. *Id.* § 4.5 (d).

Byrd-Moore notified Rhodes that construction had been delayed due to relocation of the sewer line for 36 days. It also sent Rhodes four letters reporting rain days prior to termination of the agreement. Byrd-Moore sent Rhodes another letter on July 21, 1997, after termination of the agreement, reporting an additional 16 days of rain.

In May 1997, Byrd-Moore sent Rhodes notice that the premises would be delivered June 1, 1997. On or about June 9, Byrd-Moore sent Rhodes a Certificate of Occupancy. This Certificate signaled delivery of the premises. However, Rhodes did not respond to this notice.

On June 27, 1997, Rhodes notified Byrd-Moore that it was terminating the

agreement. The letter stated:

> . . . This letter is to provide you with notice of your substantial and
> material breaches of the Lease which have resulted in [Rhodes's] right to
> terminate the Lease. Pursuant to Article 4 of the Lease you were to give
> [Rhodes] written notice thirty (30) days prior to the anticipated Delivery Date
> of December 1, 1996 that the Premises would be available for delivery.
> Notice of the anticipated delivery Date was finally given on June 17, 1997.
>
> On the Delivery Date the Premises were to be complete in
> accordance with the Plans and the Initial Common Area Improvements were
> to be complete in accordance with Section 4.1 and 4.2. As of today's date
> neither the Premises nor the Initial Common Area Improvements are
> complete in accordance with the terms of the Lease.
>
> [Byrd-Moore] claims that there have been seventy-one (71) days of
> Force Majeure delay in completion of the Initial Common Area Improvements
> and the Premises. While, as set forth more fully below, [Rhodes] disagrees
> with such claim, even assuming for the sake of argument that the seventy-
> one day delay is legitimate, the Premises and the Initial Common Area
> Improvements should nonetheless have been delivered to the [Rhodes] on
> February 9, 1997. Pursuant to Section 4.5(b), [Rhodes] has the right to
> terminate the Lease commencing on the 100th day following the due date of
> the damages, for [Byrd-Moore's] failure to timely deliver. Even allowing for
> Landlord's purported delays, damages were first due on February 16, 1997
> (Seven (7) days outside Delivery Date of February 9, 1997); i.e.,
> commencing upon June 7, 1997, [Rhodes] had the right to terminate the
> lease.
>
> By outlining the above we are by no means agreeing that there were
> seventy-one (71) days of delay for reasons of Force Majeure. Force majeure delays
> are only recognizable to the extent that rain days exceed those normally occurring
> in Birmingham during the period in question and no evidence has been provided
> that the rain that did occur was in excess of the ordinary rainfall. Further, [Byrd-
> Moore] failed to give notice of rain days contemporaneously with the time they
> occurred. . . . [Byrd-Moore's] notice of January 13, 1997 respecting rain in October,
> November and December and again in June 18, 1997 respecting rain days in
> March, April, and May can in no event be viewed to be contemporaneous with the
> time of the delay, nor should such rain have resulted in any delay during the latter
> months as the Premises was already dried in.

As a consequence of your failure to . . . deliver the Premises as required by the terms of the Lease, [Rhodes] does hereby exercise its right to terminate the Lease as permitted under Section 4.5(b) and (c). Further, [Rhodes] does hereby demand payment of the liquidated damages accorded to it pursuant to Section 4.5 of the lease in the amount of $192,643.00. ($913.00 per day x 221; December 2, 1996 through June 30, 1997). . . .

. . .

Pursuant to my telephone conversation with Jim Teichman and Frank Harrell on June 25, 1997, I understand that it may be your contention that you have completed the Premises in accordance with the Plans. The following is not intended to be a comprehensive statement of how the Premises remain incomplete because that can only be ascertained by a site visit from an architect and engineer, but a visual inspection of the Premises discloses the following:

- A granite piece has been inserted into the brick work on the front containing the saying "To God Be The Glory Great Things He Has Done, To God Be The Gory, Praise The Lord, Praise The Lord The Angels Have Sung." The Plans do not call for any granite on the Building frontage containing any statement similar to this.

- The Initial Common Area Improvements, specifically the paving and striping of the parking area, remain incomplete.

- The loading dock area of the premises is accessed by truck well which was never approved by [Rhodes].

- [Byrd-Moore] has constructed office space to the rear of the Premises which was never approved pursuant to the Plans.

- The windows and doors of the Building were not installed in accordance with the Plans.

- The roof was not installed in accordance with the Plans and no weight load testing for the roof has been done since additional reinforcing steel was installed within the Building.

Any of the foregoing items renders the Building in nonconformance with the Plans and allows the Tenant to refuse to accept the same.

Page 12 of 28

Finally, contrary to your June 18, 1997 letter, no Punch List has been provided to you. According to Section 4.4 of the Lease, [Rhodes] shall deliver to [Byrd-Moore] within ten (10) [days] after the Delivery Date a Punch List of items not yet complete in accordance with the Plans. As the Delivery Date has never been established, [Rhodes] is not required to deliver a Punch List.

Please do no further work on the Building as Rhodes does not and will not accept delivery of the Premises.

Teichman Affidavit, Exh. J.

Upon receipt of the above letter, Mr. Byrd responded, stating that he "disagreed with most, if not all, of it." Plaintiff/Third Party's Exh. P (Plaintiff/Third-party's Motion for Partial Summary Judgment). Indeed, it appears that Rhodes continued to participate in the agreement in some form after it sent Byrd-Moore the termination notice. For example, in an affidavit, Mr. Byrd stated that he had met with the project engineer for Rhodes on August 27, 1997 to discuss defects the engineer had observed. Mr. Byrd also stated that Byrd-Moore "repaired or cured the defects noted by [the engineer.] It appears that this work was performed at the behest of Rhodes after it had terminated the agreement.

Byrd-Moore filed a Complaint against Rhodes, asserting breach of contract and seeking specific performance of the agreement. It also alleged that Rhodes and Helig-Meyers had intentionally interfered with its contractual relationship with the project lender.

Rhodes, in response, asserted claims against Byrd-Moore, as well as The Byrd Companies, Inc., Realtors, and W. Wood Byrd, Jr., seeking a declaratory judgment and payment of the liquidated damages, and asserting claims of fraud, intentional interference with contractual relations and defamation.

III.  DISCUSSION

A.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.  BREACH OF CONTRACT – WRONGFUL TERMINATION OF THE AGREEMENT

Rhodes contends that it properly terminated the agreement because (1) the contract gave Rhodes the authority to terminate the contract if the project was not completed and delivered in accordance with the contract and/or liquidated damages were not paid; and (2) when the building was finally delivered it was not complete, the portions of the building that were constructed contained numerous defects and structural problems, and portions of the building did not comply with specifications. It contends it had a contractual and common law right to terminate. This Court does not consider the other grounds asserted by Rhodes for terminating the agreement because it finds Rhodes was within its rights to terminate the agreement pursuant to section 4.5.

The agreement, as amended required Byrd-Moore to complete and deliver the premises to Rhodes by December 1, 1996. However, the premises and common areas were not completed by this date and, indeed, the premises were not delivered by Byrd-Moore until June 10, 1997.

Section 4.5(a) of the agreement requires Byrd-Moore to pay $ 913/day, as liquidated damages, for each day completion and delivery is delayed beyond December 1, 1996. These payments are to be made weekly and Rhodes, under the terms of the agreement, has the right, "at **any** time after one hundred days following the date on which such payment is due [December 1, 1996] and prior to the time such required payment is made

Page 14 of 28

by [Byrd-Moore] to [Rhodes], to terminate this Lease by written notice of termination to [Byrd-Moore]." Def. Exh. 1, § 4.5(b) (emphasis added). Byrd-Moore received written notice from Rhodes that it was terminating the agreement on June 27, 1997, which was more than 100 days after December 1, 1996. It claims that the liquidated damage provision was an "absolute obligation" for failure to timely complete and deliver the premises. Therefore, it contends that it was entitled to terminate the agreement when (1) the premises were not completed and delivered by December 1, 1996, and (2) Byrd-Moore did not begin to pay liquidated damages arising from the delay, as provided for in the agreement.

Byrd-Moore contends, however, that Rhodes was not authorized under the terms of the agreement to terminate. It claims that, pursuant to the force majeure provision in the agreement, it was entitled to an extension due to delays caused by the relocation and expansion of the Jefferson County sewer line and rain delays. Also, Byrd-Moore contends that its failure to pay liquidated damages did not authorize Rhodes to terminate the agreement because Rhodes owed Byrd-Moore "a substantial amount of money" for change orders and this amount was a set off against the liquidated damages claimed by Rhodes.

The Court begins its analysis of the agreement, as it must, with the recognition that the interpretation of unambiguous terms of a contract is a question of law for the court. McDonald v. U.S. Die Casting & Development Co., 585 So. 2d 853, 855 (Ala. 1991)("If the terms of the contract are plain and unambiguous, the construction of the contract and its

legal effect become questions of law for the court.").[6] The dispositive issue is whether the

delay caused by rain and the relocation of the sewer were "caused by an event of Force

Majeure" under the terms of the agreement.

As set forth above, the agreement defines "force majeure" as:

> acts of God, enemy or hostile government action, . . . fire or other casualty
> or other events or occurrences which are beyond the reasonable control of
> the party obligated to perform hereunder or which are caused by the other
> party hereto; provided however, that rain shall not constitute an element of
> force majeure except to the extent the amount of rainfall during the period
> from the commencement of the construction by [Byrd-Moore] to the
> completion of the construction of the premises pursuant to Article 4 exceeds
> the historically normal amount of rainfall experienced at the Premises.

Def. Exh. 1, § 1.1(d). However, no event may be considered an excuse for delay

occasioned by a force majeure, unless Byrd-Moore provided Rhodes contemporaneous

written notice of a delay caused by force majeure. Id. §§ 4.5(d), 20.4.

### a.   Delay Caused by Rain

Byrd-Moore contends that it is entitled to an extension of the delivery date deadline

equal to the amount of delay due to rain. It contends that it complied with the provisions

of the agreement regarding providing notice to Rhodes of a force majeure delay. The

evidence shows the following notice:

1.   October 2, 1996 -- Reported 10 days of delay due to rain in August 1996 and

9 days of delay due to rain in September 1996.

_____

[6]The agreement provides, "the laws of the State of Alabama shall govern the
validity, performance, and enforcement of [the agreement]." Def. Exh. 1, § 20.15.

2.      January 13, 1997 -- Reported 6 days of delay due to rain in October; 8 days of delay due to rain in November; and 12 days of delay due to rain in December, 1996.

3.      June 2, 1997 -- Reported 10 days of delay due to rain in January; 9 days of delay due to rain in February.

4.      June 18, 1997 -- Reported 9 days of delay due to rain in March; 9 days of delay due to rain in April; and 8 days of delay due to rain in May.

The agreement provides if delivery is delayed "due to delays caused by an event of Force Majeure, then Landlord shall provide Tenant with notice of such delay and the amount of time of such delay." Def. Exh. 1, § 4.5(d). Also, "no event of delay shall be deemed to be a consequence of Force majeure should Landlord have failed to provide notice to Tenant of such delay contemporaneously with the time of such delay." Id. Notice, pursuant to the Agreement (§ 20.4) shall be in writing.

Force Majeure includes "events or occurrences which are beyond the reasonable control of the party obligated to perform hereunder or which are caused by the other party hereto." Id. § 1.1(d). Rain is not an element of force majeure "except to the extent the amount of rainfall . . . exceeds the historically normal amount of rainfall experienced at the Premises." Id. Rhodes contends that the letters did not comply with the notice requirements because (1) the letters were not sent contemporaneously with the occurrences of rain; (2) the letters did not indicate that the amount of rain exceeded the historically normal amount of rainfall during those periods; and (3) the letters did not indicate that the rain had caused or would cause delay in the completion of the construction. Byrd-Moore contends that section 20.6 of the agreement "contains no

Page 17 of 28

requirement of notice to Rhodes of an event force majeure." Plaintiff's Brief, p. 6. However, section 4.5 specifically states that "no event of delay shall be deemed a consequence of Force Majeure should [Byrd-Moore] have failed to provide notice to [Rhodes] of such delay contemporaneously with the time of the delay." Clearly, for an event to be deemed a force majeure under the agreement, it must be of a type within the definition of force majeure, contained in § 1.1(d), *and* Byrd-Moore must have provided notice of the force majeure event "contemporaneously with the time of the delay."

In addition to requiring that notice be provided of a force majeure delay, the Court notes that the agreement provides that rain is only a force majeure event if the amount of rainfall "exceeds the historically normal amount of rainfall." The notice provided by Byrd-Moore was not contemporaneous with the delay and did not state that the rain was of such an extent that it was a force majeure event. Indeed, the record contains no evidence that the amount of rain claimed as a force majeure delay exceeded the "historically normal amount."

Therefore, this Court finds that Byrd-Moore, under the unambiguous terms of the agreement, is not entitled to an extension of the delivery date due to rain as a force majeure event.

### b.    Relocation of the Sewer

Byrd-Moore contends that it is "entitled to an extension of the delivery date under § 4.5(a) pursuant to the delays caused by the relocation and expansion of the Jefferson County sewer line." Plaintiff's Brief in Opposition to Motion for Summary Judgment, p. 3. It contends that the relocation and expansion of the sewer line delayed construction and

delivery of the premises from October 1996 to May 1997, as well as construction of the paved areas and landscaping until August 1997, due to a "cease and desist order"[7] issued by Jefferson County. *Id*. at pp. 3-4.

Byrd-Moore contends that the "cease and desist" order constitutes "hostile government action," which is an event beyond the "reasonable control" of Byrd-Moore and thus is a force majeure event.

Rhodes contends, however, that Byrd-Moore did not send it proper notification of a force majeure delay and, therefore, any delay caused by relocation of the sewer line was not -- by definition of the agreement -- a force majeure delay. It also contends that the moving of the sewer line was part of the agreement and therefore, any delay was within the control of Byrd-Moore. Finally, Rhodes contends that, even if the moving of the sewer line is a force majeure event, Byrd Moore told Rhodes that the moving of the sewer line had caused a 36 day delay, and, if this delay is considered, Rhodes contends, it was still within its rights under the agreement to terminate as of June 27, 1997.

In a letter dated October 6, 1996, Jefferson County informed Byrd-Moore to stop construction over the sewer line. The letter also stated that the County recognized that negotiations were on-going between the County and Byrd-Moore, but that no agreement had been finalized and construction was occurring over the existing sewer line, which the County demanded Byrd-Moore stop immediately.

---

[7]Byrd-Moore received a cease-and-desist demand letter, not a court order for injunctive relief. However, such distinction is not material for purposes of deciding the issue of whether such letter or order is a hostile government action under the terms of the agreement.

The Court finds that any delay resulting from the letter from Jefferson County demanding that construction cease over the existing sewer line was not a force majeure delay. Section 3.1 of the agreement provides that Byrd-Moore "represents and warrants" that it had, or would obtain, approval from Jefferson County regarding the relocation of the sewer line on or before the "Contingency Date," which was, at the latest, August 1, 1996. The cease-and-desist demand letter was a direct result of Byrd-Moore not obtaining the approval of Jefferson County regarding the relocation of the sewer line, prior to the commencement of construction. Therefore, any delay resulting from the cease-and-desist demand of the County was not a "hostile government action," or otherwise beyond the control of Byrd-Moore.

Byrd-Moore argues that the agreement contemplates delay in delivery of the premises due to the relocation of the sewer line. However, the plain language of the agreement does not contemplate delay in *delivery*, only delay in commencement of the lease agreement.[8]  Therefore, the plain language of the agreement does not allow for an extension of the delivery date due to the cease-and-desist demand of Jefferson County.

_____

[8]Section 4.2 provides:

> In the event that the sewer line designated on the Site Plan has not been relocated prior to the Delivery Date [December 1, 1996], [Rhodes] shall nonetheless accept *deliver* of the Premises; provided, however, that such relocation shall not interfere with or delay [Rhodes] fix-up and finish work within the Premises. In the event that such relocation shall result in a delay of [Rhodes] fix-up and finish work [Rhodes] shall give landlord notice of the same and the "Commencement Date" (as herein after defined) shall likewise be postponed by an equal number of days.

Page 20 of 28

c.     Payment of Liquidated Damages

Under the terms of the agreement, Byrd-Moore became liable for liquidated damages when it failed to deliver the premises on December 1, 1997. On that date, and continuing until delivery, Byrd-Moore was required to pay Rhodes $913 per day. If the payments were not made within 30 days of the date they were due, Byrd-Moore was deemed to be in default under the agreement. Moreover, any time subsequent to 100 days after payment of liquidated damages is due and before payment of liquidated damages were made, Rhodes had the right under the agreement to terminate the agreement.

Byrd-Moore contends that Rhodes did not have the right to terminate the agreement based on the non-payment of liquidated damages because it "never once demanded payment of liquidated damages, nor did Rhodes ever express any concern about the delay in the delivery of the premises until June 27, 1997, when its lawyer sent the purported termination letter to [Byrd-Moore]." Plaintiff's Brief in Opposition to Motion for Summary Judgment, p. 9. Moreover, Byrd-Moore contends that it was not required to pay liquidated damages because "Rhodes owed [Byrd-Moore] a substantial amount of money for change orders made by Rhodes during the construction of the premises." *Id*. Finally, Byrd-Moore contends that under the terms of the agreement, Rhodes had to terminate the agreement, if at all, no later than May 27, 1999.

i.     Failure of Rhodes to Demand Payment of Liquidated Damages

Byrd-Moore contends that it was not required to pay liquidated damages to Rhodes due to the delay in delivery of the premises because Rhodes never demanded payment

Page 21 of 28

or otherwise "express[ed] any concern about the delay in the delivery of the premises until June 27, 1997." *Id.* This, Byrd-Moore contends, constitutes a waiver of Rhodes's right to terminate the agreement.

The Court notes that the contract does not require Rhodes to demand payment of liquidated damages arising from a delay in the delivery of the premises before it may exercise its right to terminate. Therefore, without a duty to demand the liquidated damages, Rhodes cannot be said to have waived the right to such damages, and the resulting right to terminate the agreement if the liquidated damages were not paid because it did not demand the liquidated damages.

Moreover, Alabama law specifically notes that inclusion of a liquidated damages provision contemplates that the agreement continues after the passing of a deadline.

In *Alpine Construction Company v. Water Works Board*, 377 So.2d 954, 955 (Ala. 1979), the Alabama Supreme Court held:

> Building and construction contracts frequently provide that if the contractor fails to complete the work contracted for by a specified date he shall be liable to the contractee in liquidated damages, usually on a per diem basis. 13 Am. Jur. 2d, *Building and Construction Contracts*, § 86, at 87. The provision for liquidated damages in the contract before us is of this kind. It stipulates that the contractor shall "pay to the owner for each and every calendar day that he shall be in default in completing the work within the times stipulated, the sum of One Hundred Dollars ($100.00)." As such, the contract plainly contemplated continuation by the contractor in the event that Alpine could not complete the work within the specified deadlines. There is, therefore, no merit to the contention that the water Works Board waived liquidated damages by allowing Alpine to continue. To the contrary, liquidated damages, under the contract here, presupposed in fact such continuation as the very basis for their assessment.

*Id.* Thus, based on Alabama law, Rhodes has not waived its right to terminate the agreement for failure to pay liquidated damages merely because it allowed work to continue on the project.

Byrd-Moore has failed to provide this Court with substantial evidence or legal support that Rhodes waived its right to terminate the agreement.

ii. Set-off

Byrd-Moore contends that it was not required to pay liquidated damages, and thus Rhodes could not terminate the agreement because it failed to pay, because Rhodes owed Byrd-Moore money, which it claims it was entitled to use as a set-off against any liquidated damages.

The liquidated damage provision is clear that liquidated damages accrued when the premises were not delivered by December 1, 1996. The fact that Byrd-Moore may have claims based upon changes in the plans for which Rhodes had not paid does not toll the 100-day time limit for paying liquidated damages under the clear terms of the agreement.

Therefore, this Court finds that, under the terms of the agreement, the passing of 100 days between the date the premises was due to be — but was not — delivered and the date of termination was not tolled by the existence of a possible claim of set off against the amount of the liquidated damages.

d. Section 4.5(c)

Byrd-Moore contends that Rhodes could terminate for delay in delivery of the premises only if it did so by May 27, 1997, in accordance with section 4.5(c) of the agreement. Section 4.5(c) provides:

> If the Delivery Date has not occurred by [March 28, 1997], in addition
> to the entitlement to liquidated damages . . . [Rhodes] may upon written
> notice to [Byrd-Moore] within sixty (60) days following [March 28, 1997],
> terminate this Lease and neither Landlord nor Tenant shall have any further
> rights and obligations hereunder, except that the obligation of [Byrd-Moore]
> to pay [Rhodes] its liquidated damages shall survive such termination.

Def. Exh. 1, § 4.5(c).

If the only basis on which Rhodes sought to terminate this agreement was Byrd-
Moore's failure to deliver the premises by March 28, 1997, this Court would agree that its
termination on June 27, 1997 was untimely, under the unambiguous terms of the
agreement. However, this section provides for termination due to Byrd-Moore's failure to
deliver the premises by March 28, 1997; it does not so limit termination due to Byrd-
Moore's failure to pay liquidated damages. Section 4.5(c) does not provide the time
limitation for termination of the agreement pursuant to § 4.5(b). Rhodes terminated the
agreement more than 100 days after liquidated damages had come due and before
liquidated damages were paid. Therefore, Rhodes's termination of the agreement was
timely.

Moreover, the Court finds that Rhodes is entitled to liquidated damages from
December 1, 1996 until June 10, 1997, the date the property was delivered by Byrd-Moore,
or $173,470.00 ($913 per day x 190 days).

Rhodes's Motion for Summary Judgment as to Byrd-Moore's claim for breach of
contract/wrongful termination and its claim for liquidated damages is due to be granted.

## 2.   OTHER CLAIMS

In addition to its breach of contract claim based on Rhodes's termination of the

agreement, Byrd-Moore asserts, in the Pretrial Order, claims of breach of contract (change

orders) and intentional interference with business relations. Rhodes and Helig-Meyers

contend that, because it did not wrongfully terminate, it is entitled to judgment as a matter

of law on these claims. Its entire argument in support of summary judgment as to these

claims is set as follows:

### Defendants are entitled to Summary Judgment

The undisputed facts demonstrate that Rhodes was entitled, as a
matter of law, to terminate the Agreement on any one of a number of
grounds. Thus, the Defendants are entitled to summary judgment on all of
Plaintiff's claims, because all of those claims are based on the premise that
Rhodes wrongfully terminated the agreement and refused to accept delivery
of the Project.[footnote 7]

[footnote 7] Summary judgment on the Plaintiff's claim for tortious
interference with business relations is proper because it is dependent on the
breach of contract claims, and because independently, the Plaintiffs [sic]
cannot satisfy various elements of the claim, such as intentional interference
and absence of justification for the interference. . . . Similarly, Plaintiff's
claims for specific performance are not viable as Wachovia bank has
foreclosed on the subject property . . . and specific performance is not an
appropriate remedy in this case.

Brief in Support of Defendant's Motion for Summary Judgment, p. 16 & n.7 (citations

omitted).

In this Circuit, the party moving for a summary judgment must demonstrate that

there is no disputed issue of material fact and that it is entitled to judgment as a matter of

law. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)(citing *Celotex*, 477

U.S. at 323-25, 106 S. Ct. 2553-54)). Defendants' argument does not satisfy this burden.

Page 25 of 28

Defendants have not pointed to any evidence in the record to show that Byrd-Moore cannot claim and prove, as a set-off or as an independent breach of contract, that it is owed payment for work performed in accordance with change orders and at the direction of Rhodes, before and after termination. Moreover, neither Rhodes's Statement of Fact nor its argument demonstrate that it is entitled to judgment as a matter of law on the intentional interference with a business relation claim. Although Rhodes may be able to show that Byrd-Moore was not damaged by Rhodes's communication with Wachovia and/or that its communications were justified, Rhodes has not carried its burden in demonstrating the same in its Motion for Summary Judgment.

The Court does agree, however, that Byrd-Moore is not entitled to specific performance of the Lease Agreement, due to this Court's finding that Rhodes was entitled to terminate the agreement. This Court's dismissal of Byrd-Moore's claim for breach of contract/termination necessarily encompasses dismissal of its claim for specific performance of the agreement.

Therefore, Rhodes's Motion for Summary Judgment is due to be denied as to Byrd-Moore's claims of breach of contract (change orders) and intentional interference with business relations, but is due to be granted as to the claim for specific performance.

## B. PLAINTIFF'S & THIRD-PARTY DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Byrd-Moore and the third-party defendants, W. Wood Byrd, Jr., and Byrd Companies, Inc., filed a Motion for Partial Summary Judgment as to Rhodes's claims of

fraud and defamation. The Court notes that these claims are not included in Rhodes's position statement in the Pretrial Order. Therefore, these claims have been waived. *See* Fed. R. Civ. P. 16(e); *Ramada Development Co. v. Rauch*, 644 F.2d 1097, 1111 (5th Cir. Unit B May 1981)("failure to indicate in the pretrial order that an issue remains for trial ordinarily precludes proof on such issue to the detriment of the party who bears the burden of proof" (citing *Pacific Indemnity v. Broward County*, 465 F.2d 99, 103-04 (5th Cir. 1972)). Plaintiff and Third-Party Defendants' Motion for Summary Judgment is due to be granted and the counterclaim/third-party fraud and defamation claims are due to be dismissed.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that there are no disputed issues of material fact and Summary Judgment in favor of Defendant is due to be granted as a matter of law on Byrd-Moore's claim of breach of contract (wrongful termination) and its claim for specific performance. The Court also finds that Rhodes is entitled to judgment as a matter of law as to its claim of liquidated damages in the amount of $189,904.00. Summary Judgment is also due to be granted as to Rhodes's counterclaims and third-party claims of fraud and defamation.

However, Rhodes's Motion for Summary Judgment as to the remaining claims asserted by Byrd-Moore is due to be denied. Accordingly, the claims remaining in this case are Byrd-Moore's claims for breach of contract (change orders) and intentional interference with business relations. The Court will enter an Order contemporaneously herewith in accordance with this Memorandum of Opinion.

The parties are urged to settle these remaining claims. To that end, the Court will order the parties, jointly, to notify this Court, in writing, on or before July 29, 1999, as to whether they wish to submit the remaining claims to mediation.

DONE this __17th__ day of July, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE